Healey *v.* Healey.

JAMES HEALEY

*v.*

ELIZABETH L. HEALEY.

An agreement by a married woman, owning a separate estate, made with her husband, to reimburse him from such estate for moneys loaned to her, or paid by him for the benefit of her estate, on the faith of such agreement and at her request, will be enforced, in equity, against her separate estate.

On bill, answer, replication and proofs taken before a master.

*Mr. Allen B. Endicott* (with whom was *Mr. William I. Smyth,* ·of the Philadelphia bar), for the complainant.

*Mr. Joseph Thompson,* for the defendant.

GREEN, V. C.

These parties are husband and wife. They were married January 1st, 1885. At that time the complainant was the owner of five small houses in West Philadelphia, unencumbered and worth, as ascertained by their subsequent sale, $7,250. Their rental value was $780 per annum.

The defendant was the owner of a house and lot at Atlantic City, known as the " Melos Cottage," subject to a mortgage of $3,000 and a judgment of $800. The Melos Cottage had a rental value of from $800 to $1,000 year, and defendant refused an offer of $9,500 and consented, at one time, to sell it for $10,000.

The complainant seeks to recover from the defendant $1,000, which he alleges he loaned to her, at her special instance and request, to pay her indebtedness for taxes, water rents, insurance, and a balance for building her house, and also a further sum of $250 to pay a balance she owed for a piano. Further, that his wife requested him to pay off the mortgage upon her property, promising at the time to sell the said property, and from the proceeds thereof to reimburse him the amount advanced by him, as well as the said $1,250, and alleges that, relying on said promises, he sold his houses and from the proceeds paid off and satisfied the $3,000 mortgage and the $800 judgment.

An agreement by a married woman, owning a separate estate, made with her husband, to reimburse him from such estate for moneys loaned her, or paid by him for the benefit of her estate, on the faith of such agreement and at her request, will be enforced, in equity, against her separate estate. *Story Eq. Jur. §§ 1372, 1373; Livingston v. Livingston, 2 Johns. Ch. 537; Black v. Black, 3 Stew. Eq. 215; S. C. on appeal, 4 Stew. Eq. 798; Woodward v. Woodward, 3 DeG., J. & S. 672; Butler v. Butler, L. R. (1 Q. B. Div.) 831.*

Such agreement can only be enforced in a court of equity. *Woodruff v. Clark, 13 Vr. 198; Rusling v. Rusling, 18 Vr. 1; National Bank of Rahway v. Brewster, 20 Vr. 231.* The foundation of the action is a contract made by the wife with her husband. *Wood v. Chetwood, 17 Stew. Eq. 64; affirmed, 18 Stew. Eq. 369.* The defendant, by her answer, denies the contract, and the burden of proof is therefore upon complainant to prove the contract, and its execution by himself.

A great mass of testimony has been taken, much of which is irrelevant and immaterial to the real issue. Whether the complainant drank to excess, or whether the defendant cruelly de--

serted her husband, or left him only when strength, patience and self-respect were well nigh exhausted, would be material in another action, but throw but little light on the question whether complainant advanced money for the betterment of defendant's estate, or loaned her money, on her agreement to repay him from the proceeds of the sale of her property.

The case is conspicuously barren of dates, amounts, checks, receipts, accounts and instruments in writing connected with the transactions involved. The whole testimony, with the exception of two receipts, rests on the recollection of witnesses. A mortgage was produced before the master, but has been mislaid.

The testimony of the complainant tends to prove the contention of his bill, but on the vital point of his case he is contradicted by his wife.

The advancements claimed to have been made are amounts appropriated :

*First.* To the payment of an installment of $1,500 on the mortgage on the defendant's property.

*Second.* To the final payment of $1,500 on said mortgage.

*Third.* To discharge the judgment of $800 held by James Byrne.

*Fourth.* Other amounts claimed to have been loaned.

The evidence shows that complainant did from time to time furnish his wife with sums of money—the amounts are in most cases indefinite, the times uncertain, and the attendant circumstances obscure.

It is undisputed, however—

That the complainant and defendant, shortly after their marriage, made mutual wills, each leaving to the other his or her property, and that said wills were left in the possession of the defendant.

That the defendant had charge of all domestic arrangements for the support and maintenance of the family.

That during the first year after their marriage complainant sold one of his houses in West Philadelphia for $1,425 or $1,450. That the second year he sold two more of said houses for $1,300 each. That the rent of all of said houses—$13 a month—was,

16

Healey v. Healey.

as collected by the complainant, handed over by him to the defendant, up to the time of the sale of the third house. That the defendant in 1888 sold his two other houses for $1,600 each, none of the proceeds of which came to the hands of defendant.

· That the Melos Cottage was rented during the years 1885 and 1886 for $800 a year. That the parties occupied it in 1887 and defendant kept boarders, from which. business she made considerable money. That in 1888 she received $900 for its rent and in 1889 the same amount, and that said rent was received by defendant.

That $1,500 was paid February 2d, 1886, on account of the mortgage on the Melos Cottage, through Mr. Guillou, a conveyancer and real estate agent in Philadelphia, and that $1,425 of that amount was derived from the sale of the first house of complainant, and was given by him to defendant for such purpose.

· That the balance of said mortgage, viz., $1,500, was paid by the defendant to Mr. Downs, the owner, January 10th, 1887.

That in December, 1886, complainant paid Ames Byrne his judgment against defendant of $800.

That complainant gave various sums of money to the defendant, and that her anti-nuptial debts were paid.

Were the moneys advanced by the husband to the wife voluntary gifts, or made under an agreement to repay it out of her separate estate? She contends the former, he the latter. As to the mortgage, he is, to a certain extent, corroborated by the testimony of John Byrne, with whom the parties boarded in 1888. He says that there was a dispute between the parties at the dinner-table; he does not know exactly what it was about, but the complainant went up-stairs and brought papers down, which he showed to witness, whose testimony proceeds as follows:

"*Q.* Well, it was nothing but an ordinary bond and mortgage, was it?

"*A.* That is what it was.

"*Q.* It did not say on it that he paid it, did it?

"*A.* It did not say on it that he paid it, but he asked her in my presence if he had not paid it; what it said there I do not exactly recollect.

"*Q.* And she said nothing in reply?

"*A.* She didn't make him no answer.

"*Q.* Now, just state what he said in relation to her paying him back this money, and how it was to be paid back.

"*A.* Well, the way he stated she was to pay it back was, that the house was to be sold after he had cleared it, and he was to take his part and she was to take her part, and they were to invest this in property in West Philadelphia, I understand, or some way that way; both was to take equal parts—that is, what each one had invested there; they had invested their own money."

Mr. Guillou says:

· "There was a desire on his part to get that property sold, and Mrs. Healey had agreed also and wished it sold; that was shortly after their marriage; he came to me and said he could sell it, and wanted to know if I would give him half of the commission, and I told him, ' Certainly,' or he might even have the whole of it if he sold the property.

. "*Q.* Who placed it in your hands for sale, Mrs. Healey or Mr. Healey?

: "*A.* Mrs. Healey was the one that spoke to me in the first place."

The defendant also admits that she did agree with her husband to sell the Melos Cottage, and continued in that frame of mind until her suspicions were aroused by a remark made by him when, she says, he was intoxicated, indicating that he would get control of her money and do with it as he chose.

I think the weight of evidence is that there was an agreement between the parties that the Melos Cottage was to be sold, and the complainant reimbursed for moneys which he might advance to pay off the mortgage.

What amount does the evidence show was paid by complainant on account of the mortgage?

He sold one of his houses in West Philadelphia in the first year of their married life—he says for $1,450, and she $1,425. She admits that he gave her the latter sum for the purpose of making a payment on the mortgage, and that it was from the sale of his house. The time and amount of this advance we are enabled to fix from a receipt given by Mr. Guillou, with whom the money was left for the purpose of making the payment. This receipt is dated September 22d, 1885, and is for $1,425.

The first payment on the mortgage was February 2d, 1886, and was $1,500, being, Mr. Guillou says, the $1,425 he received from defendant from the sale of complainant's house, and the balance made up from rents received from her own property.

Healey *v.* Healey.

Fourteen hundred and twenty-five dollars must be considered to have been given by the complainant to the defendant under an agreement on her part to reimburse him from a sale of the Melos Cottage.

The final payment on this mortgage was made January 10th, 1887. It was made by the defendant personally to Mr. Downs, the owner, at defendant's house—whether by check or money does not appear. The amount is not stated, but it was at least $1,500, as that balance was due on the principal. The complainant says that about this time he sold two houses in West Philadelphia for $1,300 each, and that he gave his wife $1,500 of the amount so received to make this payment. This she denies, and says that she made the payment principally with her own money. Complainant produces no copies from the record to show the dates or amounts of the sale, nor does he state in what shape he handed his wife the amount. During the years 1885 and 1886 defendant's house was rented for $800 a year, and she says that she received the rents of complainant's houses as a gift, which would amount to $780 a year besides.

There is no satisfactory corroboration of the complainant as to this second amount. The testimony of John Byrne and his mother, as to the dispute between the parties, at the dinner-table at their house, is relied on as furnishing such evidence. It is to be noted that these witnesses do not agree as to what really took place. John says when complainant showed the mortgage to defendant, and asked her if he had not paid it, she made him no answer. The mother says:

"She said, 'You didn't pay it;' he said, 'Hush, for pity sake,' and he said, 'John, hold on; I will show you the whole thing,' and he went up and brought this paper and showed John what it was, and he says to her, 'Did I pay that?' she said, 'Yes.'

"*Q.* She acknowledged that he had paid off the bond and mortgage of $3,000, did she?

"*A.* Yes, sir."

The witness had given the conversation—the leading question of counsel at the end was his conclusion, and the answer of the witness cannot be taken as anything more than an assent to his

Healey v. Healey.

suggestion.  Testimony of witnesses to a conversation between others, with reference to a transaction in which they have no personal interest, some eighteen months after it has taken place, and as to which the witnesses do not agree, is not sufficient, in my judgment, to establish a claim of this character.  The testimony on which the court should give relief in these matrimonial cases should be clear and positive.  It is a part of the case which should be susceptible of such proof.  The complainant appears to have kept a bank account, to have made investments and to have knowledge of business methods.  He should at least have been able to show how he had provided the funds for the last payment, as he did for the first.  Besides, the silence or assent of the defendant to the complainant's question may be explained by the fact that the defendant does not deny that the first installment of the mortgage was paid with the money received from her husband.  As to the argument that her account of where she got the money is not satisfactory, it must be remembered; if such is the case, that the burden of proof is on him and not on her.  It is contended that defendant is not to be believed because she is contradicted as to some collateral matters, but the same must also be said of the complainant; and if the rule, *"Falsus in uno, falsus in omnibus,"* is to be applied to one, it must be to the other.

There is no dispute that the complainant paid James Byrne the amount due on his $800 judgment.  He contends that it and the other amounts were advanced by him on the agreement insisted on.  The defendant admits the payment of the judgment, but insists that it was voluntary on his part; that he promised her before their marriage, and as an inducement thereto, to pay all her debts.  It is urged in the bill, and on the argument, that the confession of this judgment on the eve of the marriage was a fraud on the complainant—even if so, he knew all the facts before he paid the judgment—but I fail to see in what it defrauded him, unless in expectation, or what significance it had, as to his marital rights, under existing law, or at all, unless he had made an ante-nuptial promise to pay such of her debts as were a lien on the property, which promise he felt binding, and in-

tended to keep. The theory of the complainant, that this marriage on the part of the defendant was of a mercenary character, tends to confirm the wife's claim that such promise was made. She is also corroborated in her statement by her sister, who testifies that she heard the promise made. If such promise was made, it would not, however, affect the obligation of the post-nuptial agreement to reimburse him for the advances, really made by him on the strength of it, to pay off the mortgage. If she chose to make such an agreement notwithstanding his promise, and he acted on it, she must keep her part of it, but only that. The contention that the complainant paid the judgment, on the faith of an agreement by his wife to repay him from her separate estate, is denied by her, and rests on his uncorroborated testimony, and cannot be sustained.

These considerations apply to, and dispose of, the other claims of the complainant, and render unnecessary an examination of various questions raised.

I advise a decree that the complainant is entitled to recover $1,425, with interest from February 2d, 1886; that the same is a charge on the Melos Cottage, and that, unless paid in sixty days from the date of the decree, a *fieri facias* issue for sale of said property to discharge the same.